UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VICKI OETJENS and ERIC
OETJENS,

       Plaintiffs,

v.

COVIDIEN LP, MEDTRONIC USA,
INC., and MEDTRONIC, INC.,

       Defendants.

Case No. 22-11220
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT [34] AND TO STRIKE [35]**

---

Vicki Oetjens had surgery in October of 2020. Had all gone to plan, a diseased portion of her colon would have been removed, then the healthy ends would have been stapled together. But when the surgical stapler was deployed, no staples fired. This left a hole in Vicki's large intestine requiring surgical repair. Vicki had to use an ostomy bag until she had a second surgery to reverse the first and reconnect her intestine. When Vicki developed a hernia at the site of her incision, that second surgery led to a third.

So in June of 2022, Vicki and her husband Eric Oetjens sued the entities that manufactured the stapler: Medtronic USA, Inc., Medtronic, Inc., and Covidien LP (collectively "Covidien"). (ECF No. 1; *see* ECF No. 10.) The Court partially granted Covidien's motion to dismiss, leaving three remaining claims: two product liability claims for defective manufacturing (negligent manufacture and breach of implied

warranty) and Eric's derivative claim of loss of consortium. (ECF No. 24.) Covidien now moves for summary judgment on all three. (ECF No. 34.) It also moves to strike one of the Oetjens' proposed expert witnesses (ECF No. 35) and argues for the exclusion of another in its summary judgment motion. The parties jointly stipulated to stay their remaining expert discovery deadlines until Covidien's motions are resolved. (ECF No. 36.)

For the reasons below, the Court denies Covidien's motions for summary judgment and to strike.

## I. Background

Because Covidien seeks summary judgment under Federal Rule of Civil Procedure 56(a), the Court views the facts in the light most favorable to the nonmovants, Vicki and Eric Oetjens. *See Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023).

A little anatomy is helpful in conceptualizing the underlying medical issue. The bowel consists of the large and small intestines. The large intestine includes the colon followed by the rectum.



2

In October of 2020, Vicki Oetjens underwent bowel resection surgery to treat her diverticulitis. The plan was to remove a diseased portion of Vicki's lower (i.e., sigmoid) colon, then reconnect the healthy end of the colon to the rectum to restore the natural flow of the digestive system. (*See* ECF No 37, PageID.435–436, 534–535.) Relevant here, the medical term "anastomosis" refers to the second step—both the procedure in which a surgeon connects two tubular body structures (e.g., "performing an anastomosis") and the connection itself that is created (e.g., "a strong anastomosis between the colon and rectum"). During Vicki's preoperative appointment, her surgeon, Justin Chamberlain, explained that "a relatively short segment of [her] colon" needed to be removed, which would leave "an adequate length of remaining colon that seemed like, at least based on a CAT scan, would easily reach the rectum for a good anastomosis." (*Id.* at PageID.437.) He also advised that things could look different once in surgery. (*See id.* at PageID.437–438, 517.)

But her imaging proved accurate. Chamberlain "found nothing surprising from an anatomic standpoint that would have changed [his] preoperative discussion with [Vicki]." (*Id.* at PageID.439; *see id.* at PageID.446, 451.) He successfully removed "around six inches or so" of diseased colon—what he called "a very regular amount of colon to have to remove during these surgeries" (*id.* at PageID.451)—and, according to his operative note, was "[s]atisfied with the dissection" (ECF No. 39-1, PageID.681). "Up until that point," Chamberlain testified, "surgery was going beautifully and there were no other issues." (ECF No 37, PageID.554; *see id.* at PageID.439, 449–452; ECF No. 39-1, PageID.681.) So he proceeded to the next step.

To create the colorectal anastomosis, Chamberlain used a surgical stapler, as he had many times before. (*See* ECF No 37, PageID.469.) Specifically, he used the "EEA [End-to-End Anastomosis] Circular Stapler With Tri-Staple Technology," a single-use surgical stapler designed, manufactured, and distributed by Covidien. (ECF No. 10, PageID.45–46.) Per Covidien's description, the device is "intended to be used during" exactly the sort of procedure Vicki was having, that is, "laparoscopic surgical procedures of the [digestive] tract." (ECF No. 39-1, PageID.895; *see* ECF No. 37, PageID.536 (Chamberlain testifying that "in terms of model of stapler the EEA stapler is . . . far and away [the] most common method of reconnecting a colon and rectum together").) The surgeon first gets the stapler into position where he intends to create the anastomosis. Unless properly positioned, the stapler will not fire. (ECF No. 39, PageID.654 (citing ECF No. 39-1, PageID.902); *see* ECF No. 37, PageID.409 ("The stapler is designed to not be able to fire unless everything is properly lined up and there is a green bar showing in the window indicating its readiness."); ECF No. 39-1, PageID.900.) The surgeon then fires the stapler by fully depressing its handle. (ECF No. 39, PageID.654 (citing ECF No. 39-1, PageID.904–905).) "An[] audible and tactile firing indicator will provide additional feedback of firing completion." (ECF No. 39-1, PageID.905.) When the stapler is deployed, two things happen nearly simultaneously. The stapler fires a concentric ring of staples (to create a circular-stapled anastomosis connecting the tubular body structures) and cuts away excess tissue (to enable a clean seal). (*Id.* at PageID.678; *see id.* at PageID.895.) The surgeon finally removes the stapler and disposes of it. (*See id.* at PageID.678, 895.)

But the stapler malfunctioned during Vicki's surgery. Chamberlain removed the stapler from its sterile packaging at the appropriate time in the operating suite, properly positioned and readied the stapler at the anastomosis site, and manually depressed the stapler without incident (ECF No. 10, PageID.46–48; *see* ECF No. 37, PageID.454–457; ECF No. 39-1, PageID.681)—but it misfired (*see* ECF No. 37, PageID.408, 458). According to Chamberlain's operative report, "when the [stapler] was removed it became apparent that [it] had cut but not fired staples." (ECF No. 39-1, PageID.681.) In other words, the stapler had only "half worked" (ECF No. 37, PageID.410); the knife blade deployed as intended, cutting "a large hole in the rectum," but no staples had fired, leaving the two sections of bowel unconnected (*id.*; *see id.* at PageID.458 ("During that loosening [when the stapler is released and removed after deployment], the colon and rectum basically fell apart, so there was never any connection made. At that point there was a hole in [Vicki's] rectum. So my assumption at that point was the stapler cut but did not fire the staples.")).

This posed an issue. It would have been "not as big of a deal" if the hole were in Vicki's colon rather than her rectum, Chamberlain explained in his deposition, because the colon is long to begin with—that is, "[t]here are many ways to . . . release colon to make more colon reach down to more rectum" so the two can be reconnected. (*Id.* at PageID.466.) In contrast, "[t]he hole in the rectum is a problem because you only have so much rectum. Most humans only have about 15 centimeters of rectum" (*id.*), whereas "[t]he average length of the human colon is around six feet" (*id.* at PageID.434). "[A]nd the lower you have to go on the rectum for an anastomosis there's

probably a higher risk of leakage of that anastomosis." (*Id.* at PageID.466); *see* Joanne Favuzza, *Risk Factors for Anastomotic Leak, Consideration for Proximal Diversion, and Appropriate Use of Drains*, 34 Clinics Colon & Rectal Surgery 366, 367 (2021), https://perma.cc/K67F-RW27 ("[A]nastomoses less than 5 cm from the anal verge had 6.5 times higher anastomotic leak rates when compared with those above 5 cm."). "So [when] dealing with a hole in the rectum, [the question is] how do we kind of reconstruct this and still perform an anastomosis[,] [s]pecifically without having to try to dissect out more of the rectum." (ECF No. 37, PageID.466.)

Chamberlain called his senior partner[1] to the operating room to consult. (*Id.* at PageID.467; ECF No. 39-1, PageID.681.) Together they came up with a plan to use a second stapler in conjunction with a purse-string suture to shrink the hole formed by the first stapler and create the anastomosis. (ECF No. 37, PageID.467–468; ECF No. 39-1, PageID.681.) This time, the stapler both cut and fired. (ECF No. 37, PageID.469.) "There was nothing abnormal about how the second stapler performed," says Chamberlain. (*Id.* at PageID.546.) So Vicki's colon and rectum were reconnected.

Chamberlain then conducted a "leak test," a standard secondary test to ensure the anastomosis was airtight. (*See id.* at PageID.469–470, 547–548.) It was not. (*See id.* at PageID.469.) The "[i]nspection revealed a small defect," per Chamberlain's operative note. (ECF No. 39-1, PageID.681; *see* ECF No. 37, PageID.544–547.) If

---

[1] Chamberlain consulted Michael Charboneau, who later performed Vicki's hernia repair surgery after Chamberlain left the practice. (*See* ECF No. 35-3, PageID.395; ECF No. 37, PageID.493–494.) Charboneau is the Oetjens' second expert witness, whose causation testimony Covidien also disputes in its motion for summary judgment. (ECF No. 34, PageID.320–321, 326–327.)

unaddressed, there was a "very high" likelihood that the bowel's contents would leak into Vicki's abdominal cavity when normal bowel functioning resumed. (ECF No. 37, PageID.548; *see id* at PageID.529.) Chamberlain "place[d] two repair sutures" at the site of the defect, "at which point [Vicki] then passed her leak test."[2] (*Id.* at PageID.470; *see id.* at PageID.469–470, 546–548, 681–682.)

But Chamberlain was still concerned. (*See id.* at PageID.471; ECF No. 39-1, PageID.682.) He reflected that after the first stapler "cut but did not staple," he "had to redo the colorectal anastomosis." (ECF No. 37, PageID.554.) And "[t]hat anastomosis was technically challenging to perform, that pursestring suture was a tough suture to place." (*Id.* at PageID.549.) And "the fact that [he] had to place a couple of posterior repair sutures made [him] a little bit more concerned about it." (*Id.* at PageID.471.) He also knew that "a negative leak test did not completely rule out the possibility of colorectal anastomotic leakage." (*Id.* at PageID.548.) He testified that "[he] couldn't be as guaranteed that [the anastomosis] would heal the right way after having to do it a second time." (*Id.* at PageID.554.)

Meanwhile, Chamberlain had another option: "a diversion" (*id.*), also known as a diverting loop ileostomy. A diverting loop ileostomy is a short-term, reversible procedure that essentially reroutes (or diverts) intestinal waste through an opening

---

[2] There is some disagreement about whether Chamberlain performed one or two leak tests after Chamberlain used the second stapler (*compare* ECF No. 34, PageID.323, 331–332, *with* ECF No. 39, PageID.661–662), and the record is unclear on the question (*compare* ECF No. 37, PageID.469–470, 546–548, *with* ECF No. 39-1, PageID.681–682). Either way, the Court's analysis is unchanged, so neither version is more favorable to the Oetjens as the nonmoving party.

in the stomach (a "stoma") and into an external "ostomy" pouch to give the injured parts farther down the digestive tract a chance to heal. (*See id.* at PageID.474–475); *Ileostomy*, Nat'l Libr. of Med., https://perma.cc/9AKD-CCCR. Anastomotic leakage is made less likely "without the stress of normal digestion passing through," and if leakage occurs it is less dire. A. Mendelson, *Diverting Loop Ileostomy*, Radiology in Plain Eng. (Feb. 11, 2024), https://perma.cc/CD7S-9F8N; (*see* ECF No. 37, PageID.475 ("Leakage from a colorectal anastomosis that has stool actively going through it has a much higher likelihood of . . . making a patient much more ill than leakage from a colorectal anastomosis that does not have stool actively going through it."); *id.* at PageID.552.) A follow-up surgery can then be done reversing the ileostomy and reconnecting the intestine as originally intended, this time with increased odds of a smoother, stronger anastomosis. (*See id.* at PageID.474–475); Mendelson, *Diverting Loop Ileostomy*, *supra.* Out of an "abundance of caution," Chamberlain "elected to perform a diversion." (ECF No. 37, PageID.554; *see* ECF No. 39-1, PageID.682 (Chamberlain's operative note stating "[a]t this point due to the difficulties informing her anastomosis we elected to . . . perform[] a diverting loop ileostomy").) He testified that "in [his] judgment [he] thought it better for her to have an ileostomy for several weeks"—i.e., for her bowel contents to be redirected into an ostomy bag—"than to have the potential for leakage from her anastomosis." (ECF No. 37, PageID.549; *see id.* at PageID.474.)

Post-op, Vicki was inpatient at the hospital for five days, a duration "not out of the ordinary" even had her surgery gone as planned. (*Id.* at PageID.478.) But a key

difference was that she had an ostomy bag, which she would not have had after a bowel resection. (*See* ECF No. 10, PageID.49; ECF No. 39, PageID.650.) Once home, she required an ostomy nurse's assistance. (ECF No. 37, PageID.478–479, 484, 555.) The day Vicki was discharged from the hospital, though, "home care had not been established for her yet" (*id.* at PageID.479), so when her ostomy bag started leaking— "a typical situation with someone with a new ileostomy" (*id.* at PageID.478)—she had to go to the emergency room for help (*id.* at PageID.478–479).

Eventually, more than a month after the original surgery, Chamberlain performed the ileostomy reversal surgery. (*Id.* at PageID.487.) Vicki recovered in the hospital for two days. (*Id.* at PageID.491–492.) Some time later, she developed a hernia at the site of the 16-inch incision made during her ileostomy reversal procedure. (*See id.* at PageID.488–491 (Chamberlain explaining why Vicki's reversal surgery was not done laparoscopically); *see also id.* at PageID.494 (Chamberlain testifying that incisional hernias are a common side effect of midline laparotomy incisions, i.e., the type of incision made during Vicki's reversal procedure).) She underwent hernia repair surgery in the summer of 2023. (ECF No. 35-3, PageID.395; ECF No. 37, PageID.493–494.)

Covidien has now filed motions for summary judgment and to strike. (*See* ECF Nos. 34, 35.) The motions are fully briefed (*see* ECF Nos. 37, 39 (the Oetjens' responses); ECF Nos. 38, 40 (Covidien's replies)) and do not require further argument, *see* E.D. Mich. LR 7.1(f). The Court addresses each motion in turn.

## II. Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Put another way, Covidien is entitled to summary judgment only if no reasonable jury could find in favor of the Oetjens. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

One way Covidien may discharge its initial summary judgment burden is by showing there is an absence of evidence on an essential element of the Oetjens' case. After all, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," such that "there can be no genuine issue as to any material fact" for a jury to decide. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If Covidien demonstrates that the Oetjens' lack sufficient evidence to support their case, the burden shifts to the Oetjens to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

The Oetjens bring two product liability claims against Covidien for defective manufacturing. They allege both negligence and breach of implied warranty—the two

causes of action recognized in Michigan[3] product liability cases. *See Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp. 2d 752, 767 (E.D. Mich. 2010) (citing *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736–37 (6th Cir. 2000)). "A breach of implied warranty claim tests the 'fitness of the product,' while a negligence claim tests a defendant's conduct to determine 'whether it was reasonable under the circumstances.'" *Teal v. Argon Med. Devices, Inc.*, 533 F. Supp. 3d 535, 543 (E.D. Mich. 2021) (quoting *Auto Club Grp. Ins. Co. v. All-Glass Aquarium Co., Inc.*, 716 F. Supp. 2d 686, 689 (E.D. Mich. 2010)).

Under either theory of recovery, a plaintiff must show, at minimum, that the product (1) was defective, (2) was defective when it left the defendant's control, and (3) caused the plaintiff's injuries. *Id.* (citing *Meemic*, 717 F. Supp. 2d at 768); *see Genaw v. Garage Equip. Supply, Inc.* ("*Genaw II*"), 604 F. Supp. 3d 653, 660 (E.D. Mich. 2022). The Oetjens allege that Covidien's surgical stapler (1) either had a "faulty" firing mechanism or was not loaded with staples during the manufacturing process, (2) remained in that "exact condition" from the time it left Covidien's control to the time it was removed from its "tamper proof sterile package" in the "sterile operative suite," and (3) injured Vicki by, among other things, cutting a large hole in her rectum and failing to create an anastomosis connecting her colon and rectum, resulting in the need for corrective procedures. (*See* ECF No. 10, PageID.47, 50, 54–55, 60–62.)

---

[3] Both parties agree that Michigan product liability law governs. (*See* ECF No. 10, PageID.44; ECF No. 18, PageID.134; *see also* ECF No. 34, PageID.327.)

Only the last element is in dispute. According to Covidien, the Oetjens lack sufficient evidence to establish causation—it claims "the evidence . . . is so one-sided that [Covidien] must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Covidien first contends that the Oetjens' key causation expert, Chamberlain,[4] must be barred from testifying because the Oetjens failed to satisfy their expert disclosure obligations under Federal Rule of Civil Procedure 26(a)(2)(B). (*See* ECF No. 34, PageID.330, 333–334.) And even if Chamberlain's testimony were permitted, argues Covidien, it is too speculative to create a genuine dispute for trial. (*See id.* at PageID.326–327, 330); *Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 630 (6th Cir. 2013) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995))). Either way, says Covidien, the Oetjens cannot carry their burden as to the essential element of causation, so their claims cannot survive summary judgment. *Cf. Meemic*, 717 F. Supp. 2d at 768–70 (granting defendant summary judgment on defective manufacturing claims on alternative grounds: plaintiff's expert testimony was inadmissible so plaintiff "ha[d] no evidence to establish causation," *id.* at 768, and

---

[4] Because the Court concludes that Chamberlain's causation testimony is admissible and sufficient to create a fact issue on causation, it need not reach Covidien's summary judgment arguments directed at Charboneau. Similarly, because Covidien's sole expert disclosure argument is that the Oetjens violated the Rule 26(a)(2)(B) written report requirement, the Court need not address the sufficiency of the Oetjens' Rule 26(a)(2)(C) summary disclosures.

plaintiff's expert testimony "amount[ed] to little more than 'mere suppositions'" so it was insufficient to establish causation, *id.* at 769–70).

## A. Rule 26

The threshold issues for the Court are whether the Oetjens have complied with their Rule 26 expert disclosure requirements and, if not, whether Chamberlain's causation testimony must be excluded.

Federal Rule of Civil Procedure 26(a)(2) sets out the disclosure requirements applicable to expert witnesses. It creates two categories: (1) retained expert witnesses who must provide written reports ("Rule 26(a)(2)(B) witnesses") and (2) non-retained expert witnesses who need only provide a summary of opinions in advance of trial ("Rule 26(a)(2)(C) witnesses").

"Frequent examples" of expert witnesses exempt from the expert report requirement "include physicians or other health care professionals." Fed. R. Civ. P. 26(a)(2)(C), Advisory Committee Notes to 2010 Amendment; *see* Fed. R. Civ. P. 26(a)(2)(B), Advisory Committee Notes to 1993 Amendment ("A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."); *Dean v. United States*, No. 19-10210, 2020 U.S. Dist. LEXIS 108532, at *17 (E.D. Mich. June 22, 2020) ("A long line of cases has affirmed the general principle that a 'treating physician' is not required to produce a formal report under Rule 26(a)(2)(B).").

That said, if a treating physician functions as a retained expert, he is still subject to Rule 26(a)(2)(B). *See Adkins v. Marathon Petro. Co., LP*, 105 F.4th 841, 849

(6th Cir. 2024); *Avendt v. Covidien Inc.*, 314 F.R.D. 547, 556–57 (E.D. Mich. 2016). In making this functionalist distinction, the determinative factor "in this Circuit, and indeed throughout the federal court system," is the scope of the proposed testimony. *Barnes v. CSXT Transp., Inc.*, No. 13-00525, 2017 U.S. Dist. LEXIS 53650, at *68–69 (W.D. Ky. Apr. 7, 2017); *see Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 870–73 (6th Cir. 2007) (setting out factors relevant to whether treating physician is subject to expert report requirement); *Dobbins v. Greyhound Lines, Inc.*, 336 F.R.D. 144, 146 (E.D. Mich. 2020) ("[T]he substance of a treating physician's testimony, and not his or her status as a treating physician, determine[s] whether a Rule 26(a)(2)(B) report will be required or whether a Rule 26(a)(2)(C) disclosure will suffice." (quoting *Avendt*, 314 F.R.D. at 556–59)).

Put simply, if a physician arrived at his causation opinion in the course of treating his patient, he does not need to prepare an expert report. *See Adkins*, 105 F.4th at 849. "But if the physician 'formed his opinion at the request of [the patient's] counsel' and 'in anticipation of litigation,' courts should treat the physician as a retained expert and require compliance with Rule 26, including the production of a report." *Id.* (alteration in original) (quoting *Fielden*, 482 F.3d at 869, 871). "[T]here is no reason to conclude that Rule 26(a)(2)(C) was intended to allow treating physicians to give expert opinions that go beyond the scope of treatment and diagnosis without having to prepare a report with respect to those further opinions." *Avendt*, 314 F.R.D. at 556 (citation omitted).

14

Here, the parties agree on two critical facts: Chamberlain is a treating physician, and he did not prepare an expert report as part of the Oetjens' expert witness disclosures. They likewise agree on the key legal principles: Chamberlain is exempt from Rule 26(a)(2)(B)'s expert report requirement unless his opinions were formed outside the course of his care and treatment of Vicki. What the parties dispute is whether Chamberlain's testimony arises from his care and treatment of Vicki or whether it exceeds that "permissive core." *Fielden*, 482 F.3d at 871. According to Covidien, because Chamberlain's opinions "were only raised when he sat for a deposition more than three years after [Vicki's] surgery," they were "formed in anticipation of litigation or formed outside the scope of the treatment relationship." (ECF No. 34, PageID.333 (emphasis omitted) (citing *Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 810–11 (6th Cir. 2005)).)

Not so. The simple fact that Chamberlain's opinions were *articulated* for the first time after treatment does not mean they were *formed* only after treatment. What matters is the scope or source of his opinions—whether they are based on the facts he learned during his actual treatment and observation of Vicki (i.e., personal knowledge) or are instead based on facts he obtained outside the normal course of care. *See, e.g.*, *In re Aredia*, 754 F. Supp. 2d 934, 937 (M.D. Tenn. 2010) ("To the extent that the source of the facts which form the basis for a treating physician's opinions derive from information learned during the actual treatment of the patient—as opposed to being subsequently supplied by an attorney involved in the litigation—then no Rule 26(a)(2)(B) [report] should be required."); *Avendt*, 314 F.R.D. at 557

15

(explaining that whether a treating physician must file a "full-blown expert report" under 26(a)(2)(B) or a summary disclosure under (C) is "dependent on 'the scope, substance, and source of the intended testimony'" (quoting *Ulbrick v. UPR Prods., Inc.*, No. 08-13764, 2011 U.S. Dist. LEXIS 11965, at *10 (E.D. Mich. Feb. 8, 2011))).

True, in *Mohney v. USA Hockey, Inc.*, 138 F. App'x 804 (6th Cir. 2005), the case on which Covidien relies, the Sixth Circuit upheld the exclusion of a treating physician's causation opinion where the physician gave that opinion "long after the incident occurred" and failed to provide an expert report. *Id.* at 811. But the court's conclusion was not purely a function of timing. Instead, it focused on the source of the treating physician's opinion. *See id.* at 810–11. The evidence supported that the physician relied on later-acquired information—video footage of the plaintiff's ice hockey accident—and "[t]here [was] no evidence that [the physician] reached the same conclusions regarding causation at the time he treated [the plaintiff]." *Id.* at 811. Covidien, in contrast, points to no evidence that Chamberlain's causation opinions are based on anything other than the facts he learned while treating Vicki or were formed at any point outside the time of that treatment.[5] *See In re Aredia & Zometa Prods. Liab. Litig.*, No. 06-1760, 2010 U.S. Dist. LEXIS 129339, at *13 (M.D.

---

[5] In its reply brief, Covidien makes a new argument that Chamberlain's deposition testimony was "improperly elicited by [the Oetjens'] counsel . . . in response to leading questions" and thus was formed at the request of counsel or in anticipation of litigation. (ECF No. 40, PageID.908.) Covidien again conflates articulation and formation. And to the extent Covidien takes issue with the credibility of Chamberlain's testimony (*see id.* ("[D]eposition testimony made only as an answer to Plaintiffs' counsel's questioning is not a sufficient basis for the medical expert opinion required in order to establish causation.")), that argument is better suited for cross-examination at trial.

Tenn. Dec. 7, 2010) ("Dr. Roser's causation opinion was developed during his care and treatment of Ms. Eberhart. It was a part of his working diagnosis and a basis for his treatment of her."). The date of Chamberlain's deposition does not by itself subject his testimony to Rule 26(a)(2)(B).

So Chamberlain may offer his opinion on the cause of the Oetjens' injuries without filing a Rule 26(a)(2)(B) report.

### B. Speculativeness

Having concluded that Chamberlain may testify on the issue of causation, the Court turns to the substance of Chamberlain's causation opinions. "It is well settled under Michigan law that a prima facie case for products liability requires proof of a causal connection between an established defect and injury." *Skinner v. Square D Co.*, 516 N.W.2d 475, 478 (Mich. 1994). Covidien asserts that Chamberlain's testimony is too speculative to establish a causal connection—specifically that it (1) was not expressed to the requisite degree of medical certainty and (2) "presents multiple, speculative theories instead of a single causation opinion." (ECF No. 34, PageID.332.) The Court disagrees.

Start with the standard of proof the Oetjens must meet to show causation. A product liability plaintiff "must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Skinner*, 516 N.W.2d at 480; *see Holloway v. Gen. Motors Corp.*, 271 N.W.2d 777, 780 (Mich. 1978) (explaining that a plaintiff may sustain her burden with direct or circumstantial evidence). The same preponderance

standard applies when a plaintiff uses an expert, including a treating physician, to prove causation.[6] *See Johnson v. Memphis Light Gas & Water Div.*, 695 F. App'x 131, 137 (6th Cir. 2017) ("Thus, because a plaintiff need only prove causation by a preponderance, for an expert opinion to be helpful to the jury, a doctor need only testify that his conclusion is more likely than not true." (citations omitted)); *id.* at 137 n.7 ("[A]ll of the state courts within the Sixth Circuit have held that [expert] opinions must express the expert's belief that a fact is probably true, and not just possibly true." (collecting cases)). Chamberlain's testimony, along with his post-operative report, support his opinion that but for the misfiring of Covidien's stapler during the first surgical procedure Vicki's injuries would not have occurred—i.e., she would not have had an unsuccessful anastomosis leaving a colorectal hole that then necessitated follow-up procedures to repair the hole and make sure she was not susceptible to bowel leakage.

Covidien resists this conclusion. It contends that Chamberlain's causation opinion does not meet this standard. Citing Chamberlain's use of qualifying language like "may" (ECF No. 34, PageID.332) and "suppose" (*id.* at PageID.330), Covidien asserts that Chamberlain "can only speculate as to what would have happened if the first stapler had fired staples," so any opinions he provides are based only on

---

[6] The Sixth Circuit "has not held for purely federal law purposes with what degree of certainty an expert must express his opinion for it to be admissible." *Johnson*, 695 F. App'x at 137 n.7. But it has held that the expert witness must ultimately opine that "a fact is probably true, and not just possibly true." *Id.* (collecting cases); *see id.* at 136–37 (explaining that "attach[ing] the modifier 'to a reasonable degree of medical certainty'" to opinion testimony is neither necessary nor sufficient to make the expert opinion admissible).

possibility, not probability (*id.* at PageID.322). For example, says Covidien, "[w]hen pressed to give a decided answer, Dr. Chamberlain hedges his opinion by stressing he would be 'speculating' or that a proposed theory of causation is merely a 'possibility.'" (*Id.* at PageID.327; *see id.* at PageID.322 ("When pressed on whether it was 'more likely or not' that Plaintiff Vicki Oetjens would have 'passed that leak test' after the use of the first stapler, Dr. Chamberlain testified that would require a 'degree of **speculation**.'" (emphasis in original)).) This argument is again reductive and overly formalistic.

An expert witness' acknowledgment of some uncertainty does not by itself make his opinion mere conjecture or speculation. "It is the quality and substance of a physician's testimony, not the use of particular 'magic words,' that determines whether it rises to the level of reasonable medical probability, i.e., to the level necessary to prove a particular medical fact." *Chesnut v. United States*, 15 F.4th 436, 447 (6th Cir. 2021). "[T]he fact that an expert does not use absolute terms but rather couches the opinions in terms of 'can' or 'may' does not render it speculative or unreliable." *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 745 (N.D. Ohio 2011) (citation and internal quotation marks omitted). As the Sixth Circuit has recognized, "[p]hysicians speak their own language in carrying out their professional responsibilities." *Johnson*, 695 F. App'x at 137. Thus, "[i]n examining . . . expert testimony as to proximate cause, . . . substance should prevail over form, and the expert testimony should be examined in its total meaning, rather than word-by-word." *Chesnut*, 15 F.4th at 447 (quoting *Morris v. Hoffman*, 551 S.W.2d 8, 11 (Ky.

Ct. App. 1977)). "In other words, the district court must assess the whole of the expert's opinion, not isolated instances of word choice." *Berbaum v. AMCO Ins. Co.*, No. 21-01004, 2022 U.S. Dist. LEXIS 37497, at *16 (W.D. Tenn. Mar. 3, 2022) (citation omitted).

Covidien may be correct on the semantics—Chamberlain does hesitate to conclude that, had the first stapler fired properly, Vicki would have passed her leak test and he would not have performed a diverting loop ileostomy. (*See, e.g.*, ECF No. 34, PageID.332 ("Dr. Chamberlain reiterated: 'there's a degree of **speculation** here whether or not I would have performed [a loop ileostomy]' . . . if the first stapler had fired staples." (alteration and emphasis in original) (citation omitted)); *see also id.* at PageID.325, 332, 334.) Indeed, he acknowledges that "many factors" can affect "the mechanical performance of an anastomosis" and contribute to the eventual "judgment call" to perform a diverting loop ileostomy. (*Id.* at PageID.332.) But semantics are not dispositive. To discharge its summary judgment burden, Covidien must point to more—it must show that the *totality* of Chamberlain's testimony could not support a reasonable factfinder in concluding that, more likely than not, a diverting loop ileostomy would not have been performed had the first stapler not malfunctioned. It fails to do so.

What is more, Covidien's argument relies on a faulty premise. It asserts that the Oetjens cannot show causation as a matter of law because they cannot establish a causal link between the stapler's defect and Chamberlain's decision to perform the diverting loop ileostomy. This skips a step. True, the Oetjens allege that Vicki

required a diverting loop ileostomy because of the malfunction. But they also assert that when the stapler misfired, it created a "large hole in [Vicki's] rectum." (ECF No. 39-1, PageID.681; *see* ECF No. 39, PageID.667 ("The big picture is that the 'stapler cut but did not staple, leaving [a] large hole in the anterior surface of the rectum.' That is the proximate causation of plaintiff's injury and subsequent need for a diverting loop ileostomy, reversal surgery, and hernia repair surgery." (quoting ECF No. 39-1, PageID.680)); *see also* ECF No. 10, PageID.48.) That is injury enough. The Oetjens only need to provide evidence linking that injury (or any one injury) to the alleged defect to satisfy their causation burden at this stage. Contrary to what Covidien argues, they do not need to specifically show a causal connection between the stapler's malfunction and the diverting loop ileostomy to survive summary judgment. That question would go to damages, not liability.

On the question of whether the perforation in Vicki's bowel was caused by the stapler's malfunction, Chamberlain does not equivocate. The causal connection almost goes without saying. He testifies that he properly deployed the stapler (*see, e.g.*, ECF No. 37, PageID.539–542), that it "cut but did not staple" (*id.* at PageID.554), that Vicki's bowel remained in two pieces (*see id.* at PageID.458), and that "a 28-millimeter hole in the rectum and the other end of the colon" immediately resulted (*id.* at PageID.541). Had there been no malfunction, says Chamberlain, the stapler would have reconnected the two sections of Vicki's large intestine (i.e., the colon and rectum) upon being fired, and the knife blade would have cut away the excess tissue in the way of an otherwise clean seal. (*Id.* at PageID.454, 544; *see id.* at PageID.465.)

21

So he opines it is at least probable (if not certain) that the stapler caused injury to Vicki—and Covidien does not argue otherwise. It does not even contest the underlying allegation that Vicki's rectum was cut because the first stapler misfired. It focuses instead on the causal connection between the malfunction and the subsequent injuries the Oetjens allege, namely the diverting loop ileostomy. (*See* ECF No. 34, PageID.330–332, 324–325.) At the summary judgment stage, Covidien's silence amounts to a concession. (*See* ECF No. 39, PageID.667 ("[I]t is the undisputed fact that 'the stapler cut but did not staple,' thereby leaving a large hole in the plaintiff's rectum, [which] was the proximate cause of her injuries and damages." (quoting ECF No. 39-1, PageID.680)).)

Covidien's second argument for why the Oetjens' product liability claims must fail is that Chamberlain "provides no singular theory as to what he believes caused Plaintiffs' damages" (ECF No. 34, PageID.327) and instead "has *three* separate theories of causation" (*id.* at PageID.330 (emphasis in original)). But a plaintiff has no obligation to eliminate alternative explanations of how her injury occurred. *Mulholland v. DEC Int'l Corp.*, 443 N.W.2d 340, 349 (Mich. 1989) ("A plaintiff in a product liability action need not offer evidence which positively excludes every other possible cause."). She can even offer evidence affirmatively bolstering multiple theories of causation. *See Genaw v. Garage Equip. Supply Co.* ("*Genaw I*"), 856 F. App'x 23, 27 (6th Cir. 2021) ("[P]roximate cause does not necessarily require the absence of other causes."). As long as a plaintiff presents sufficient evidence of a causal connection between the alleged defect and injury, she carries her causation

burden. *See Kaminski v. Grand Trunk W. R.R. Co.*, 79 N.W.2d 899, 902 (Mich. 1956) ("If . . . [the] plaintiff has proven sufficient facts to justify a verdict upon *one* theory, the fact that there may be one or more other seemingly rational explanations of the episode in no manner precludes a recovery."); *Mulholland*, 443 N.W.2d at 349 ("It is enough that the plaintiff establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support.").

That said, Chamberlain's testimony does *not* support three alternative causation theories. Chamberlain identifies three possibilities early in his deposition: "no staples in the device, the firing mechanism didn't work appropriately, [or] the handle [was] not squeezed the right way." (ECF No. 37, PageID.464.) But he immediately walks back the third theory, testifying that "[he] would consider that third one a lot less likely" because he "routinely visually watch[es] [his] assistant squeeze the handle" and can "tell pretty obviously if a handle is squeezed or not squeezed [because] [t]here's a pretty audible kind of click." (*Id.*; *see id.* at PageID.453–455; ECF No. 39-1, PageID.905.) And during Vicki's surgery, he "was visually watching" his assistant squeeze the handle and heard the "audible click." (ECF No. 37, PageID.464, 541; *see id.* at PageID.539–541.) Further, according to Chamberlain, the fact that the stapler cut a hole in Vicki's bowel meant its handle was properly depressed because otherwise the stapler could not fire at all. (*See id.* at PageID.453–454, 464–465; *see also id.* at PageID.409.)

The Oetjens thus assert that Chamberlain "eliminated the third possibility of the handle not being squeezed enough." (ECF No. 39, PageID.666.) And "once the 'user error' possibility was eliminated[,] the two scenarios left are both attributable to the defendant." (*Id.*; *see* ECF No. 37, PageID.465.) The Oetjens need not drill down further to carry their burden. Indeed, the relevant causation question is "whether the defect caused the injury," not "how the defect was caused." *Genaw I*, 856 F. App'x at 27. The Oetjens prevail by presenting evidence that the stapler, by malfunctioning, created the colorectal hole—regardless of whether the specific malfunction was a faulty firing mechanism or instead a failure to load staples. (*See* ECF No. 39, PageID.667 ("Whether the stapler did not staple because defendant shipped it . . . without any staples, or with a non-working staple firing mechanism, does not matter[,] as under either scenario defendant is liable for distributing a surgical stapler that breached its implied warranty of merchantability to work as intended.").)

What is more, argue the Oetjens, Chamberlain does home in on a "singular theory" of causation. Because he observed a 28-millimeter hole after the first stapler was deployed, he concluded that the stapler fired without stapling, rather than not firing at all. He wrote in his operative report that the "stapler cut but did not staple." (ECF No. 39-1, PageID.680.) He likewise testified that "something had fired, meaning the cutting mechanism had at least worked." (ECF No. 37, PageID.541.) And although he noted there would have been a hole in Vicki's rectum either way, he opined that had the stapler failed to fire altogether the hole "would have been smaller than the one that would be cut by the circling staple device." (*Id.* at PageID.459; *see*

24

*id.* at PageID.458 ("If we squeezed the handle and nothing happened, . . . we would have already had a small hole in the rectum because I'll remind you during this deployment of the stapler there is a physical spike that protrudes out through the rectal tissue.").)

In sum, Covidien is wrong that it would be preclusive for Chamberlain's testimony to support multiple causation theories. Importantly, "[q]uestions of comparative probability are to be resolved by the trier of fact." *Davis v. C.R. Bard, Inc.*, No. 11-12556, 2012 U.S. Dist. LEXIS 172925, at *21 (E.D. Mich. Dec. 6, 2012) (quoting *Holloway*, 271 N.W.2d at 781); *see Skinner*, 516 N.W.2d at 484–85 & n.20 (explaining that "courts should exercise restraint," *id.* at 485, "where there is room for balancing the probabilities, and for drawing reasonable inferences better supported upon one side than upon the other," *id.* at 485 n.20). And even if it were preclusive, Chamberlain's testimony could allow a reasonable factfinder to conclude that a hole in Vicki's large intestine was caused by the absence of staples in the first stapler. At the very least, his testimony "adequately supports a reasonable inference that the [injury] was probably caused by a defect attributable to the manufacturer," whether that be the absence of staples or the failure of the stapler to fire. *Genaw I*, 856 F. App'x at 26 (quoting *Holloway*, 271 N.W.2d at 782).

Covidien thus fails to show it is entitled to summary judgment on the basis that the Oetjens cannot carry their causation burden. Chamberlain's causation opinions are not excludable for failure to submit a Rule 26(a)(2)(B) report, nor are

they too speculative as a matter of law. The Court thus denies Covidien's motion for summary judgment.

### III. Motion to Strike

In addition to Vicki's treating physicians, the Oetjens identify Larry Petersen as a third proposed expert witness. (*See* ECF No. 35-3.) Per their expert disclosures, Petersen is "expected to testify concerning the mechanical use of the subject 28 [mm] EEA Circular Stapler." (*Id.* at PageID.395.) His attached CV specifies he is an automotive engineer whose "[l]itigation support work, in a primary engineering analysis and expert testimony role, includes . . . detailed design, failure analysis and accident reconstructions including automotive components including engine, transmission, driveline, brake and suspension and engine/transmission control components." (*Id.* at PageID.400.) Covidien protests that the Oetjens' failure to submit an expert report for Petersen violates Rule 26(a)(2)(B) and warrants exclusion of his testimony under Rule 37(c)(1). (*See* ECF No. 35, PageID.377–379.) So it moves to "strike [the Oetjens'] identification of Larry Peters[e]n, and preclude [the Oetjens] from using him in this matter." (*Id.* at PageID.369.) While Covidien makes strong arguments that the Oetjens should have proceeded differently with respect to Petersen's expert disclosures, the Court concludes for the reasons below that the Oetjens' missteps were not ultimately prejudicial, so exclusion is not necessary on that ground.

"If a party fails to provide information . . . as required by Rule 26(a)," Rule 37(c) imposes a "sanction": "the party is not allowed to use that information or witness to

supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Baker Hughes Inc. v. S&S Chem., LLC*, 836 F.3d 554, 567 (6th Cir. 2016). "The potentially sanctioned party . . . bears the burden of proving harmlessness or substantial justification." *EQT Prod. Co. v. Phillips*, 767 F. App'x 626, 634 (6th Cir. 2019) (citation omitted). Here, the parties agree that Petersen is a retained expert witness who, pursuant to Rule 26(a)(2)(B), cannot offer expert testimony without first tendering a written expert report. They also agree that no such written report has been produced. So the only question is whether the Oetjens can avoid Rule 37(c)(1)'s exclusion sanction by showing that their failure to comply with Rule 26(a)(2)(B) "was substantially justified or is harmless." *See Adkins*, 105 F.4th at 849–50.

Covidien says it is prejudiced by the absence of an expert report. (*See* ECF No. 35.) It asserts that "[Covidien's] experts have nothing to review or analyze prior to the . . . deadline for [Covidien's] expert disclosures, which prevents a response to Mr. Peters[e]n and unfairly prejudices [Covidien's] defense of this case." (*Id.* at PageID.378.) It further argues that even after the Oetjens filed their response brief "Defendants still have no idea if Mr. Petersen, an automotive engineer, will offer opinions regarding a medical device—or, if he does, what he plans to say. This unknown is highly prejudicial to Defendants." (ECF No. 38, PageID.634.)

The Oetjens, seemingly pointing to Rule 37(c)(1)'s exception for "substantially justified" nondisclosure, respond that they cannot yet produce an expert report for Petersen for two reasons. First, they cite "outstanding discovery requests" (ECF No.

37, PageID.407), asserting that Petersen cannot offer an expert opinion on whether Covidien's stapler fired without stapling, or instead failed to fire at all, until the Oetjens receive "an exemplar stapler to inspect" (*id.* at PageID.414) and depose a Rule 30(b)(6) Covidien representative with "a working knowledge of the mechanics of the stapler," specifically whether the stapler can cut without stapling (*id.* at PageID.413–414). This proposed justification, replies Covidien, "is a problem of [the Oetjens'] own making." (ECF No. 38, PageID.634.) The Oetjens "did not request a corporate representative deposition until ***after*** their expert deadline passed and ***after*** [Covidien] filed [its] motion to strike Mr. Petersen" (*id.* (emphasis in original)), and they "admit that they could have purchased an exemplar stapler, but have not done so" (*id.* at PageID.632 (citing ECF No. 37, PageID.413)). Further, says Covidien, the Oetjens should have timely submitted an expert report for Petersen, "then supplemented it if necessary—or sought additional time" (*id.* at PageID.633) by "seek[ing] an extension of their expert deadline" (ECF No. 35, PageID.382). On these points, Covidien has the better of the argument.

But, respond the Oetjens, Petersen may not need to provide an expert report at all. Indeed, the Oetjens' second reason their nondisclosure is justified is that Petersen's expert testimony is contingent upon whether Covidien raises a user error argument. They say they identified Petersen as an expert witness "for the sole purpose of having an independent engineer available . . . in the event that [Covidien] takes the position that there was some type of user error on the part of the medical staff or that a mechanical issue arises with regard to the use of the stapler." (ECF

No. 37, PageID.414.) If Covidien argues user error, then the Oetjens will provide an expert report for Petersen. (*Id.* at PageID.415.) Otherwise, the Oetjens may not need Petersen's expert testimony at all, or they may use Petersen only "as a potential engineering rebuttal witness" such that "there would be no need for an expert report." (*Id.*)

The bottom line, according to the Oetjens, is that their nondisclosure is not prejudicial. Because the parties stipulated to stay Covidien's expert disclosure deadline pending the resolution of its motions, Covidien "will not be prejudiced by allowing Mr. Petersen to submit his expert report, if necessary, once the outstanding discovery has been provided." (*Id.* at PageID.407.) They request that the Court "allow Mr. Petersen to continue to be listed as an expert engineering witness for the plaintiff until discovery is finished[,] at which time if he has any engineering opinions germane to this case he will provide a written report." (*Id.* at PageID.415.)

On this key point, therefore, the Court can find that the Oetjens' failure to timely provide an expert report for Petersen is ultimately harmless. *See Howe v. City of Akron*, 801 F.3d 718, 747–48 (6th Cir. 2015) (listing factors for courts to consider when assessing whether a party's omitted or late disclosure is substantially justified or harmless under Rule 37(c)(1), including "the surprise to the party against whom the evidence would be offered, the ability of that party to cure the surprise, [and] the extent to which allowing the evidence would disrupt the trial"); *Hensley v. Bossio*, No. 23-5606, 2024 U.S. App. LEXIS 13190, at *14 (6th Cir. May 31, 2024) (quoting *Howe*, 801 F.3d at 748). The subject matter of Petersen's expert testimony has already been

disclosed and Covidien will have an opportunity to review his report, take his deposition, and, if necessary, designate an expert witness to rebut his testimony. *See Mitsui Sumitomo Ins. Co. of Am. v. Vertiv Corp.*, No. 23-1398, 2024 U.S. Dist. LEXIS 12105, at *5 (S.D. Ohio July 10, 2024) (collecting cases). Further, no trial has yet been scheduled, so introduction of Petersen's opinions will not be disruptive.

To that end, the Court denies without prejudice Covidien's motion to strike. A separate order will follow lifting the stay on the parties' remaining expert disclosures and setting forth an amended schedule. Again, under that schedule, Covidien will have the opportunity to depose Petersen and retain a rebuttal expert witness prior to trial. This will eliminate any prejudice to Covidien and aid in efficiency should Petersen's expert report prove unnecessary.

## IV. Conclusion

Accordingly, the Court DENIES Defendants' motion for summary judgment (ECF No. 34) and DENIES WITHOUT PREJUDICE Defendants' motion to strike (ECF No. 35). A separate order will issue lifting the stay on the parties' remaining expert discovery deadlines in accordance with the description above.

SO ORDERED.

Dated: January 16, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE